TYSON, Judge.
Willie George Brown was indicted for the murder of Silvia Jewel Jones in violation of § 13A-6-2, Code of Alabama 1975. The jury found the appellant “guilty as charged” in the indictment. The trial judge set sentence at life imprisonment in the penitentiary.
Ida Jones, the victim’s mother, testified that the appellant and the victim had lived together off and on for a period of time but that the victim, Silvia Jewel Jones, was living with her prior to the victim’s death on April 30, 1983. At the time of her death, the victim had two children and the appellant was the father of the youngest child.
On the evening of April 30, 1983, the victim left Jones’ house around 6:30 with her son and her sister.
Anita Willingham, the victim’s sister and the appellant’s cousin, stated that on the night in question, she had a birthday party for her daughter at her house. At 6:30 p.m., the victim arrived at the party. A short while later, the appellant, Brown, came to the party. Brown called the victim out of the kitchen and the two went into one of the bedrooms to talk.
At some point, the appellant left the house. When Brown returned, he told Willingham that Yolanda Tueker, Willing-ham’s neighbor, wanted to see her. Will-ingham went over to Tucker’s house and returned home shortly. She went to the bathroom, knocked on the door and said, “George, Bernice wants to use the bathroom.” (R. 24). The appellant replied “Okay, in a minute.” (R. 24).
Willingham then went into her bedroom. While she was there she heard something that sounded like balloons bursting. She then saw the appellant leave the bathroom. He had a brown paper sack in his hand and something brown was protruding from the bag. When Willingham looked in the bathroom, she saw the victim, Silvia Jones, lying on the floor. She left the house and didn’t return until the next day.
Willingham testified that she did not own a fingernail file at the time of the victim’s death.
Bernice Henderson was at the party at Willingham’s on the night in question. Soon after the appellant, Brown, got to the party Henderson heard him tell the victim that he wanted to take his baby home. The victim asked how the baby would get back and the appellant told Jones to pick the baby up.
The appellant, Brown, then walked away and the victim told Henderson that the appellant was “up to a lot of mess” and she (the victim) would be glad when she left. (R. 59).
A while later, Henderson again saw the appellant talking to the victim. The appellant told the victim that he wanted to talk about the baby. The victim replied, “all babies fall.” (R. 59). Henderson then heard the bathroom door close.
A few minutes later, Henderson told Willingham she wanted to use the bathroom. Willingham knocked on the door *1193 and told the appellant this information and he replied, “Okay”.
Minutes later Henderson heard noises from the bathroom which sounded like gunshots. When the appellant, Brown, came out of the bathroom, Viola Annette Smelley asked him why he shot the victim. He replied, “I loved that girl, she shouldn’t have did me like she did.” (R. 63). He then left the house.
After Henderson looked in the bathroom and saw the victim, Silvia Jones, she called the police. She did not see a nail file in the bathroom.
Smelley testified that, as she was leaving the party, she heard shots which she thought were balloons popping. She asked Henderson what the noises were and Henderson said it was the appellant. Smelley asked the appellant, Brown, as he was leaving, why he shot the victim and the appellant replied that he loved her.
Smelley looked in the bathroom after the shooting and did not see a nail file.
Richard Hunter, one of Willingham’s neighbors, was standing in his yard on the evening of April 30, 1983. He saw the appellant drive by his house that night. A few minutes later, somebody yelled that someone had been shot. Hunter then went to Willingham’s house and tried to administer first aid to the victim. He remained in the bathroom with the victim until the paramedics and police arrived.
Hunter testified that the victim did not have anything in her hands when he arrived. He did not see a nail file in the bathroom.
Yolanda Tucker testified that the appellant, Brown, came over to her house in the late afternoon of April 30, 1983 and brought some fish. When she left to go to the Willingham’s house for the party, the appellant remained at her house. A while later, the appellant came to the party. When Tucker left the party, both the appellant and the victim were there.
At approximately 7:15 p.m., Tucker was standing outside her house. The appellant came out of Willingham’s house with his baby in his arms. He asked Tucker if she would keep the baby for a few minutes and she said yes. The appellant then left.
A few minutes later Tucker heard screams coming from the Willingham house.
Dr. Joseph Embry, a forensic pathologist with the Department of Forensic Sciences, performed the autopsy on the victim. He stated that the victim died as a result of multiple gunshot wounds. The bullets he removed from the body were given to Law-den Yates. Embry found two hairs in the victim’s right palm and gave them to Wayne Burroughs along with samples of the victim’s head and pubic hair. He checked the victim’s fingernails and did not find anything that warranted taking fingernail scrapings.
George Grubbs, a detective with the Birmingham Police Department, stated that he met with the appellant at 1:10 on the afternoon of May 1, 1983. After being advised of his Miranda rights, the appellant stated he understood them and, nevertheless, wished to make a statement. Grubbs recorded the statement which was played to the jury.
Grubbs testified that the appellant showed him a place on his arm where he had allegedly been stuck by a fingernail file. Grubbs stated that he did not notice any wounds on the appellant’s arm and that he took photographs of the appellant’s arm, which were shown to the jury.
Grubbs stated that Annie Pearl Willing-ham gave him a gun which was found under the front seat of the appellant’s car. The gun had five live rounds and one empty chamber. He gave the gun to Lawden Yates.
Donald Reynolds, an evidence technician with the Birmingham Police Department, went to the scene on the evening in question. He collected two spent projectiles from the bathroom and turned them over to the Department of Forensic Sciences. Reynolds also photographed the scene. He doesn’t recall finding a nail file in the bathroom that night. Reynolds submitted sam- *1194 pies of the appellant’s head and moustache hair to Wayne Burroughs.
Burroughs, a criminalist with the Department of Forensic Sciences, testified that the two hairs found in the victim’s hand were inconsistent with the appellant’s and the victim’s hair. In his opinion, the hair came from a third party.
Lawden Yates, a firearms and toolmarks examiner with the Department of Forensic Sciences, stated he received an Armeni-us .38 special caliber revolver from Grubbs. After test firing the gun, he determined that the three bullets removed from the victim’s body and the two projectiles found in the bathroom had been fired from this particular gun. Yates stated that it was necessary to squeeze the trigger each time the gun was fired.
The appellant, Brown, testified that he and the victim, Silvia Jones, had lived together periodically for three years before her death and they had a child together.
On the afternoon of April 30, 1983, he went over to Tucker’s house. When he arrived, Tucker was leaving for the party so he went along. At the party, he told several people about some fish he had. He said he’d get the fish and they could cook them. The appellant then left and went to Adamsville and got the fish.
After returning to Willingham’s house, he talked to several of the women there and played with his son. After a brief conversation with the victim, Silvia Jones, the appellant left with his son and went to Tucker’s house.
Tucker told him he needed to clean the fish and the appellant asked for a sack. He then went out to his car and put a couple of beers in the sack. He also put his gun in the sack because there were people around. When he went back in Tucker’s house she told him to go get Will-ingham.
The appellant then went and told Willing-ham that Tucker wanted to see her. As he was leaving, the victim said she wanted to talk to him and didn’t want anybody to hear. They went into a bedroom and talked. After a while the appellant started to leave and the victim grabbed his arm and said she had something to tell him. The two went in the bathroom and the victim closed the door.
The victim started telling him that she had seen him at Renae Earl’s house and that he was doing a lot of things for Earl. The appellant, Brown, stated that a week before her death, the victim almost hit him as he was leaving Earl’s house.
All of a sudden the victim went into a rage and grabbed the appellant around the neck and started choking him. He pushed her away and she picked up a fingernail file and stabbed his arm. The appellant then pulled his gun out to scare her. The victim then said, “I’m going to kill your black ass.” (R. 274) and lunged at him. The appellant then shot the victim and left.
The appellant testified that he had been stabbed before with a small knife by his ex-wife who was a small woman. He stayed in the hospital a few days after the incident.
Renae Earl testified that she and the appellant were friends. On several occasions before her death, the victim would call Earl’s house or drive by. Her roommate, Pam Smith, testified that the victim had come over to Earl’s house on one occasion.
I
During the cross-examination by defense counsel of the victim’s mother, the following occurred:
“Q. You don’t like him very much, do you?
“A. Would you if he killed your daughter?
“Q. Well, as a matter of fact, you pulled a gun on Mr. Brown yourself, didn’t you?
“MR. WHISONANT: Objection. This is irrelevant and immaterial. It doesn’t show the time.
“THE COURT: I need a time frame, Larry. Otherwise, I’m going to sustain.”
*1195 The appellant now claims the trial judge erred by failing to admonish this witness for her remark “Would you if he killed your daughter?” and by not instructing the jury to disregard this remark. As can be seen from the above-quoted portion of the transcript, defense counsel did not object to this witness’ answer. In fact, after she made the remark, he immediately asked her another question. The only objections made concerning this witness’ testimony were by the State.
Since defense counsel failed to object to the witness’ answer and did not immediately ask the court to instruct the jury to disregard her answer, this issue is not preserved for our review. Watson v. State, 398 So.2d 320 (Ala.Crim.App.), cert. denied, 398 So.2d 332 (Ala.1980), 425 U.S. 941, 101 S.Ct. 3085, 69 L.Ed.2d 955 (1981).
Further, defense counsel contends that the trial judge erred by failing to instruct the witness to be responsive to the questions asked after he had agreed to do so. Any error which occurred by this omission of the trial judge was harmless, due to the fact that all of the witness’ answers were responsive to defense counsel’s questions after his request had been made and granted. There is no error shown here.
II
Defense counsel contends that his examination of the appellant concerning a prior attack on the appellant was unduly restricted by the trial judge. Defense counsel argues that the facts of this incident were important to show that the appellant had a reasonable apprehension of harm when he shot the victim and, therefore, acted in self-defense.
Our examination of the record reveals that defense counsel was not unduly limited in his examination of the appellant about this incident. Defense counsel elicited that the appellant had been attacked previously by a woman who was small in stature with a small knife and that this attack resulted in his hospitalization.
The only limitation imposed by the trial judge was that the appellant could not exhibit his scars from the prior attack to the jury. The admissibility of bodily exhibitions is largely within the discretion of the trial judge. C. Gamble, McElroy’s Alabama Evidence, § 207.01(5) (3rd ed.1977); Brown v. Billy Marlar Chevrolet, 381 So.2d 191 (Ala.1980); Bury v. Marietta Dodge, 692 F.2d 1335 (11th Cir.1982). We find that the trial judge did not abuse his discretion by not allowing the appellant to show his injuries sustained from a previous attack by a third party to the jury.
This cause is due to be and is, hereby, affirmed.
AFFIRMED.
All the Judges concur.